AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original    ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| United States of America | |
| v. | |
| JUSTIN SY | |
| Defendant | |

**F I L E D**
CLERK, U.S. DISTRICT COURT

2/5/2025

CENTRAL DISTRICT OF CALIFORNIA
BY: ___vv___ DEPUTY

Case No.  2:25-mj-00522-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

Between on or about October 18, 2024 and on or about February 3, 2025, in the County of Los Angeles in the

Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 922(g)(1), 922(a)(1)(A), 933; 26 U.S.C. § 5861(d) | Felon in Possession of Ammunition; Dealing in Firearms Without a License; Firearms Trafficking; and Possession of an Unregistered Firearm |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

/s/
Complainant's signature

Ani Ghaltakhchyan, Special Agent ATF
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    2/5/2025

Judge's signature

City and state:    Los Angeles, California

Hon. Margo A. Rocconi, U.S. Magistrate Judge
Printed name and title

AUSA: Alexander H. Tran x0758

## AFFIDAVIT

I, Ani Ghaltakhchyan, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal complaint and arrest warrant against defendant Justin SY ("SY") for a violation of 18 U.S.C. § 922(g)(1): Felon in Possession of a Firearm.

2.    This affidavit is also made in support of an application for a warrant to search the following digital device (the "SUBJECT DEVICE"), seized on or about February 3, 2025, by Bureau of Alcohol, Tobacco, Firearms and Explosives Special Agents, and currently in the custody of ATF in Los Angeles, California, as described more fully in Attachment A: a black Apple iPhone with a black case seized from SY at the time of his arrest on February 3, 2025, and believed to belong to SY.

3.    The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 922(g) (Felon in Possession of a Firearm); 18 U.S.C. 18 U.S.C. § 922(a)(1) (Dealing in Firearms Without a License); 18 U.S.C. § 933(a)(1) (Firearms Trafficking); and 26 U.S.C. § 5861(d) (Possession of an Unregistered Firearm) (collectively, the "Subject Offenses"), as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and

witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and search warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5.    I am a Special Agent ("SA") with the ATF and have been so employed since June of 2021.  I am currently assigned to the Glendale Field Office of the Los Angeles Field Division of ATF, which conducts investigations into violations of federal firearms, explosives, and narcotics laws.  My experience as an ATF SA includes, but is not limited to, conducting physical surveillance, executing search and arrest warrants, and participating in controlled drug/gun purchases using informants. I have experience investigating violations of federal statutes governing firearms and narcotics.  I have also conducted surveillance of persons trafficking firearms and illegal controlled substances, and persons possessing illegal firearms.

6.    As part of my training, I attended the Criminal Investigator and Special Agent Basic Training Academies for ATF at the Federal Law Enforcement Training Center in Glynco, Georgia for approximately 27 weeks.  This training included instruction on federal and state firearms and narcotics laws and regulations.

7.    I graduated Magna Cum Laude with a Bachelor's degree in Criminal Justice and Law in Society from California State University, Los Angeles.  During my education, I completed a two-year internship with the United States Marshals Service ("USMS") in Los Angeles, CA.  During that two-year period, I spent six months at the USMS Fugitive Apprehension Task Force where I was trained to use databases, such as the National Crime Information Center, to gather background information on the subjects of investigations.

8.    I also received a Master of Science in Criminology with a concentration in Global Criminology from San Jose State University.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

9.    Since on or about October 6, 2024, SY, a convicted felon, has exchanged Instagram messages, text messages, and phone calls, using the SUBJECT DEVICE, with an ATF Confidential Informant ("CI")[1] and ATF Undercover Agents ("UCs") regarding the sale of firearms.  From October 18, 2024, to January 22, 2025, across seven audio- and video-recorded controlled transactions in the Los Angeles area, SY sold UCs and the CI approximately 13 firearms and one round of ammunition.  On February 3, 2025, SY

---

[1] The CI has been compensated approximately $1,400 thus far for his/her assistance in this investigation by ATF.  The CI has a pending criminal case in the Central District of California for firearms and drug trafficking violations and has signed a cooperation agreement with the United States Attorney's Office. The CI has been active for over two years and has consistently provided credible and reliable information.  The CI has nine prior state felony convictions, including four for drug possession, two for evading a police officer, two for felon in possession of a firearm, and one for Assault with a Deadly Weapon.

possessed and attempted to sell ATF UCs approximately 12 additional firearms.

10.  Based on the information available to me, I believe there is probable cause that SY violated 18 U.S.C. § 922(g) (Felon in Possession of a Firearm).  I also submit there is probable cause to believe that the search of SY's SUBJECT DEVICE will yield evidence of the Subject Offenses as described more fully in Attachment B.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

#### A.  SY uses Instagram to Sell Firearms

11.  Based on my review of communications between UCs and SY, law enforcement reports prepared by myself and other ATF agents, my review of audio- and video-recordings of the controlled transactions, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

a.  On or about August 21, 2024, Baldwin Park Police Department ("BPPD") Officers informed ATF that an individual by the name of Justin SY was suspected of selling firearms and narcotics.  BPPD Officer Steven Trinidad provided me with SY's Instagram account, "daaangcuhrich."  I reviewed SY's Instagram account, which is publicly available, and found Instagram stories posted on the account displaying firearms for sale.

b.  I then asked an ATF Special Agent (the "UC-1"), acting in an undercover capacity, to contact SY using his publicly available Instagram account.  UC-1 then instructed an

ATF Confidential Informant (the "CI") to follow SY's publicly available Instagram account, "daaangcuhrich."

c.    From October 1, 2024, to October 3, 2024, the CI and SY engaged in a conversation using Instagram, and SY agreed to sell the CI approximately 2 pounds of marijuana.  The CI and UC-1 coordinated to meet with SY on October 4, 2024, to complete the transaction.  SY, using Instagram direct messaged the CI the following address: 305 Whispering Pine Ln, La Puente, CA 91744. SY's DMV record lists "309 Whispering Pine Ln" ("SY's residence") as his address.

d.    On or about October 4, 2024, in an audio- and video-recorded transaction, the CI and UC-1 bought three pounds of suspected marijuana from SY and an unknown individual for $2,000 in U.S. currency.

B.    **SY Sells UC-1 and the CI One Firearm and Ammunition on October 18, 2024**

12.    On or about October 6, 2024, at the direction of law enforcement, the CI contacted SY on Instagram to discuss a firearms transaction.  The CI sent a photograph of firearms to SY and stated, "Got these for the packs u gave me! LOL!," indicating that he/she exchanged the suspected marijuana bought from SY for firearms.  SY then asked the CI how much he/she would be willing to sell the firearms for.  The CI told SY that the firearms are going to be sent "way down south" for $1,300 each, indicating that the firearms were going to be sold in Mexico.  SY then informed the CI that he (SY) buys firearms for $500 and resells them for approximately $1,000-$1,100.

5

13.  On October 17, 2024, SY posted an Instagram story displaying firearms for sale.  At the direction of law enforcement, the CI messaged SY and asked to purchase the firearms for $2,400.

14.  SY agreed to sell one of the firearms to the CI for $1,500 the next day, October 18, 2024.  The CI asked if SY wanted to meet at his "spot" (referring to SY's residence) and SY said, "Yes," followed by "But I have the buttom one then ima sell the next one to you after you buy one at a time" indicating that he would sell the firearms one at a time.

15.  On or about October 18, 2024, in an audio- and video-recorded transaction, SY sold the CI and UC-1 (i) one unknown make, model, multi caliber rifle with an obliterated serial number, and magazine, and one unknown caliber round of ammunition for $1,500 in U.S. currency.

16.  During the controlled purchase, SY pointed at the firearm's ejection port and stated, "there is already one in here."  SY also told the CI and UC-1 that the rifle uses .556 and .223.[2]

17.  UC-1 asked SY how much he wanted for the firearm and SY told UC-1, "fifteen."  UC-1 proceeded to inspect the firearm and asked SY if the firearm was loaded.  SY told UC-1 that the firearm was loaded.  UC-1 then told SY that the rifle is going "straight to Mexico" and it better be good.  SY also informed UC-1 that he has a steady line and can get "military shit."  SY

_____

[2] These numbers are a reference to the caliber of the ammunition used for the rifle.

told UC-1 that he can get "rifles, glocks, everything." SY then asked UC-1 and the CI if they are taking the firearms to Mexico, and UC-1 stated, "these are."

18.  SY also provided a phone number, (562) 955-6286 to UC-1. I know this number is associated with the SUBJECT DEVICE because UC-1 called the phone number in SY's presence and SY confirmed receiving the call on the SUBJECT DEVICE.[3] SY proceeded to show more pictures of firearms on his phone to the CI and UC-1.

19.  During this controlled purchase SY met the CI and UC-1 with an unknown individual (the "Co-Conspirator").

**C.**  **SY Sells the CI and UC-1 One Firearm on October 22, 2024**

20.  On or about October 20, 2024, SY contacted the CI on Instagram and stated he had a "Glock 19 P80" for sale for $1,000. The CI and SY discussed a meeting date. The CI and SY also discussed an "ARP" kind firearm, but SY told the CI that he got offered "2k" for the ARP.

21.  On or about October 21, 2024, SY messaged the CI via Instagram and stated, "I can do the arp for $2200 if you take that I rather sell to u." The CI and SY continued communication

---

[3] SY used the same phone number and Instagram account to set up buys discussed in this Affidavit, where he personally appeared and sold firearms to agents. After the government obtained a warrant signed by United States Magistrate Judge Charles F. Eick for SY's Instagram account (Case No. 2:24-MJ-06086), I found the same phone number, 562-955-6286 listed on his Instagram account. In addition, SY's Instagram account had the following Gmail address listed as a verified email: "juztensy97@gmail.com"

via Instagram and agreed to meet on October 22, 2024, for the purchase of two firearms.

22.    On October 22, 2024, in an audio- and video-recorded transaction, UC-1 and the CI met with SY and the Co-Conspirator at the parking lot of "SY's residence" and bought (i) one unknown make, model, serial number, 9 mm caliber pistol with one magazine for $1000 in ATF funds.  During the controlled purchase SY informed UC-1 and the CI that the "ARP" that he was attempting to sell was having issues.

23.    During the controlled purchase, UC-1 asked SY if he had a firearm of his own.  SY stated that he had a Glock 23, .40 caliber.

### D.    SY and the Co-Conspirator Sell Two Firearms to UC-1 and the CI on October 24, 2024

24.    Between October 22, 2024, and October 24, 2024, UC-1 communicated with SY via recorded text messages and calls.  On or about October 23, 2024, SY using the SUBJECT DEVICE texted UC-1 the following, "I got the arp back but I gotta sell it for $2600 he said he hooked it up only because he said "he told me that it needs to be fixed" but I don't remember him telling me that at all".  Shortly thereafter, SY using the texted the below photographs to UC-1:

 

25.  SY and UC-1 continued to communicate.  SY and UC-1
negotiated firearms prices.  SY told UC-1 that if UC-1 purchased
both ARs he could sell them for "$2500 each."  SY texted UC-1 a
photograph of a Glock pistol and negotiated the price of the
firearm with UC-1 during a recorded phone call.  Sy stated that
the Glock is his personal firearm and is the same firearm that
UC-1 saw before, referring to the October 22, 2024, controlled
purchase.  SY told UC-1 that he could give UC-1 a deal if UC-1
bought all three firearms.  UC-1 inquired about the price, but
SY said that he needed to work some numbers.

26.  Shortly thereafter, SY texted UC-1 and stated "1500."
UC-1 asked if that was the price for all three firearms, but SY
stated, "The other ones aren't ready," followed by "He still
oiling them."  UC-1 told SY that s/he could wait and pick them

up all together, but SY stated that the "gman"[4] might be gone by the following day.  SY then called UC-1 on a recorded line and stated that he is trying to get rid of the "gman" because everyone wants that one.  Eventually SY and UC-1 agreed to meet the next day, October 24, 2024, for the purchase of the Glock pistol for $1500.

27.  On or about October 24, 2024, SY sent another text message to UC-1.  SY texted UC-1 photographs of firearms and stated, "I have the gold one and the Glock".  SY told UC-1, "But I'm very firm on $2600 for the gold around" and stated that there are too many competitors.  SY and UC-1 agreed to meet on the same date for the purchase of two firearms.



28.  On or about October 24, 2024, in an audio- and video-recorded transaction, SY sold UC-1, (i) one Glock GMBH model 23GEN4 40 caliber pistol, bearing serial number UUL649 with one magazine, and (ii) one Anderson Manufacturing AM-15 multi

---

[4] Based on training, experience, and conversations with other law enforcement officers, "gman" refers to the Glock pistol.

caliber pistol bearing serial number 21240650 with one magazine for $4,100 in U.S. currency.

29.    During the controlled purchase, UC-1 and SY discussed other firearms in the Undercover vehicle, while the Co-Conspirator waited outside the vehicle.  SY told UC-1 that he can get "Dracos".  UC-1 asked SY how long that will take, and SY said it will probably take a couple days because he has to order them.  SY showed UC-1 photographs on his phone and stated that those are "coming tomorrow".  SY also told UC-1 that he is going to get Glocks with switches[5] inside.

**E.    SY and the Co-Conspirator Sell UC-1 and the CI Two Firearms on October 29, 2024**

30.    Between October 24, 2024, and October 29, 2024, UC-1 and SY continued communication via text messages and phone calls.  On or about October 25, 2024, SY texted UC-1 that he got both of the "ARs", followed by, "$2000 for one and $2500 Monday is the latest I can do."  UC-1 told SY s/he would let SY know.

31.    The following day, on October 26, 2024, SY texted UC-1, "Let me know I've been moving the Glock 43x's everyday too they are very high in command."  SY then texted the following photograph and said, "I can do $2650 with the drum clip or $2500 without the drum.  I kinda want to keep the drum lol."

---

[5] A "switch" is a combination of parts designed and intended for use in converting a weapon into a machinegun.



32.  SY and UC-1 arranged to meet on October 29, 2024, for the purchase of two firearms.

33.  On October 29, 2024, in an audio- and video-recorded transaction, UC-1 met with SY at SY's residence and purchased (i) one privately manufactured, 5.56 caliber short-barreled rifle with no serial number and a magazine,[6] and (ii) one privately manufactured AR style pistol with no serial number and a magazine for $5000 in U.S. currency.

_____

[6] The privately manufactured, 5.56 caliber rifle has no serial number or manufacturer markings.  The barrel length is approximately 8.875 inches with the attached muzzle device.  As such, based on my training and experience, I believe this item is a "short-barreled rifle" as defined under 18 USC § 921(a)(8), and a "firearm" - specifically, "a rifle having a barrel or barrels of less than 16 inches in length" - under 26 USC § 5845. I also believe that this firearm is subject to the provisions of both the Gun Control Act and the National Firearms Act. Movement in interstate or foreign commerce cannot be established based on locations of manufacture (unknown) and recovery.  The lack of a serial number and other requisite markings precludes registration of this firearm in the National Firearms Registration and Transfer Record (NFRTR).

34.   During the controlled meet, SY explained to UC-1 that both of the firearms were short barrel "ARPs."

**F.   SY Sells UC-1 and UC-2 Two Firearms on November 5, 2024**

35.   Between October 29, 2024, and November 5, 2024, UC-1 and SY continued communication via phone calls and text messages.

36.   On or about October 29, 2024, SY texted UC-1 the below photographs and said, "This is a Glock 48 mos OEM version so they worth more" followed by, "$1600 for it."



37.   On or about October 30, 2024, SY texted a photograph of a firearm to UC-1 and said, "Just got this too" and added, "This is very rare you can't get any of these out here rn."



38.   Shortly thereafter, SY texted 3 more photographs to UC-1 and said, "Let me know so I know to hold it for you or sell them."  SY stated that he can do both firearms for $3,300.

  

39.   Between October 30, 2024, and November 4, 2024, UC-1 and SY continued engaging in a conversation and agreed to meet on November 5, 2024, for the purchase of two firearms.

40.   On November 5, 2024, UC-1 and a second ATF undercover Special Agent ("UC-2") met with SY at an ATF Undercover location (the "UC location") in Los Angeles, California.

41.   Based on my review of communications between UC-1 and SY, reports prepared by myself and other ATF agents, my review of audio- and video-recordings of the controlled transactions, and my own knowledge of this investigation, I know the following:

        a.   At approximately 9:02pm, I observed SY's white BMW bearing California temporary plates DD62M24 pull into the UC location.  SY then exited the vehicle and greeted the UCs.  UC-1 introduced UC-2 to SY.  SY then walked to the trunk of his vehicle, then back to the driver side of the vehicle and grabbed what appeared to be a tan in color gun box.

        b.   SY placed the gun box on the trunk of his vehicle and the three discussed the firearms.

42.   During the audio- and video-recorded transaction, UC-1 and UC-2 purchased (i) one Glock Inc., model 48, 9 mm caliber pistol bearing serial number AHWB439 with one magazine, and (ii) one Glock Inc., 19 X 9 mm caliber bearing serial number BHNE796 with one magazine for $2,900 in U.S. currency.

    G.   **SY Sells UC-1 and UC-2 Two Firearms on January 15, 2025:**

43.   Based on my review of communications between UC-1 and SY, reports prepared by myself and other ATF agents, my review of audio- and video-recordings of the controlled transactions,

and my own knowledge of this investigation, I know the
following:

      a. Following the November 5, 2024, transaction, SY and
UC-1 kept in touch.  On or about January 3, 2025, SY texted the
below photograph of a firearm to UC-1 and said, "So far picked
this up for you":



      b. On or about January 10, 2025, SY and UC-1 continued
communicating via text messages and phone calls.  SY texted UC-1
more photographs of firearms.  UC-1 and SY discussed firearms
prices and arranged to meet on January 15, 2025 at the ATF
Undercover location.

      c. On January 15, 2025, at approximately 5:42 p.m., I
observed a white Mercedes Benz sedan enter the undercover
location garage area while being driven by SY.  SY then exited
his vehicle, opened the rear driver side door and retrieved two
firearms.  The UCs and SY then walked to the lounge area.

      d. Once at the lounge area SY placed two firearms on the

table.  UC-1 and UC-2 purchased (i) one privately made, 9mm caliber pistol with one magazine, and (ii) one Mossberg, model 500, 12-gauge shotgun bearing serial number U222163 for $2,400 in U.S. currency from SY.

e. SY told the UCs that he would be able to get other firearms later that night.  UC-1 then asked what kind and SY responded, "SKS and ARs".  SY also stated that he can also get "Glocks".  UC-1 inquired about the "Glock" prices and SY stated that he needs to negotiate prices.

f. The meeting concluded at approximately 5:50 p.m., and the group walked to the main garage area.  SY entered his vehicle and departed the undercover location.

**H.    SY Sold Three Firearms to UC-1 on January 22, 2025:**

44.  Based on my review of communications between UC-1 and SY, reports prepared by myself and other ATF agents, my review of audio- and video-recordings of the controlled transactions, and my own knowledge of this investigation, I know the following:

a. Between January 16, 2025, and January 22, 2025, SY and UC-1 continued communicating using the recorded line.  On January 17, 2025, SY messaged UC-1 and stated, "Got a clean ass AR sig sauer" followed by photographs of firearms.  SY and UC-1 continued discussing firearms, negotiating prices, and coordinated to meet on January 22, 2025.

b. SY and UC-1 met at the parking lot of SY's residence. At approximately 3:15 p.m., Baldwin Park Police Department Officer Rodas observed the garage door of SY's residence open

17

and watched SY exit through the garage and walk towards UC-1's vehicle.

c. Shortly thereafter SY approached UC-1's vehicle and entered the front passenger seat.  SY removed the firearms from the bags and discussed them with UC-1.  SY removed the Mini-Draco from the rifle bag and attempted to show UC-1 how to load the magazine.  SY handed the Mini-Draco to UC-1 and explained that the firearm was brand new and that he had the box at his residence.  SY discussed his suppliers and the types of firearms he can acquire.  In addition, SY told UC-1 that he had to drive about a 1 hour 30 minutes to acquire the "Draco."  SY stated that he drove past Victorville to acquire the "Draco."

g. During the audio- and video-record transaction UC-1 purchased (i) one Romarm/Cugir, model Mini Draco, 762 caliber pistol bearing serial number ROA 23 PH-4744 with one magazine; (ii) one Sig Sauer (Sig Arms), model SIG M400, caliber 556 rifle bearing serial number 21G004302 with one magazine, and (iii) one Russian, model SKS, 762 caliber rifle bearing serial number RH606527 for $8,300 in ATF funds.

**I.   SY Attempts to Sell 12 Firearms and Ammunition to UC-2 on February 3, 2025 and Is Arrested by ATF Agents**

45.  Based on my review of communications between UC-1 and SY, my review of audio- and video-recordings of the controlled transactions, and my own knowledge of this investigation, I know the following:

a.   During the January 22, 2025, controlled transaction UC-1 and SY discussed ordering "Dracos" from SY's

18

firearm source.  SY told UC-1 to let him know when he is ready to put in an order so SY can inform his sources.

b.   Between January 22, 2025, and November 3, 2025, SY and UC-1 continued communicating via the recorded calls and texts.

c.   On or about January 23, 2025, SY texted UC-1 the following, "Hey brotha you don't have to get the Glocks if you don't want them but would you still want the bundle?," followed by, "For the 8 coming this weekend."

d.   On or about January 25, 2025, SY texted UC-1 the following, "They haven't given me word yet, just quick update I'll call them later today and see what's up.  But we'll forsure get you that bundle."  SY proceeded to tell UC-1 that he had a total of 5 firearms, but is waiting to receive more.  UC-1 texted SY back and said, "Let your boy get all of them and then grab the package."  SY informed UC-1 that's his plan and he should have 10 in total.

e.   Between January 25, 2025, and January 31, 2025, SY and UC-1 continued communicated via the recorded line.  On or about January 31, 2025, SY texted UC-1 and said, "Are you still interested in the bundle I got 15 of them", and asked if the UC is still interested.  UC-1 and SY then had a phone call, and UC-1 asked for a photograph of the firearms.  The below photograph is what SY texted UC-1:



      f.   Between January 31, 2025, and February 2, 2025, UC-1 and SY negotiated price for the firearms via recorded phone calls and text messages.  SY texted UC-1 and informed s/him that the total price for the firearms is going to be $19,500 because he had to "bid" higher.

      g.   On February 3, 2025, UC-1 and SY agreed for SY to meet with UC-2 for the sale of the firearms at the undercover location.

      h. At approximately 8:18pm, I observed a white Mercedes Benz sedan enter the undercover location garage area while being driven by SY.  SY then exited his vehicle and greeted UC-2.  SY then removed the firearms from the vehicle and walked to the lounge area with UC-2.

      i. SY then placed all the firearms on the table in the lounge area.  UC-2 and SY engaged in a conversation regarding the firearms, and UC-2 mentioned that UC-1 is sending the firearms to Mexico.

      j. UC-2 told SY that UC-1 told him/her that there are going to be 15 firearms and SY stated that there are 12.  UC-2 confirmed the price of $19,500 for the firearms.  UC-2 then handed $10,000 to SY and told him that he/she is going to get rest of the money (UC-2 did not end up paying SY for the

firearms because the arrest took place before all the money was exchanged).

k. The following firearms were seized from SY after the arrest: (i) one Palmetto State Armory PA-15, 556 caliber rifle bearing serial number: HP009660; (ii) Sig Sauer P238, 380 caliber pistol bearing serial number: 27B024500; (iii) Mossberg MC1CS 9 caliber pistol bearing serial number: 025039CP; (iv) IDCI HP22A 22 caliber pistol bearing serial number: 4444538; (v) Taurus International PT738 TCP 380 caliber pistol bearing serial number: 35933E; Keltec CNC Industries, INC. P3AT; 380 caliber pistol bearing serial number: HX229; (vi) Taurus International G3C 9 caliber pistol bearing serial number: ACN728475; (vii) GLOCK GMBH 21CGEN4 45 caliber pistol bearing serial number: ZPF061; (ix) SCCY INDUSTRIES, LLC (SKYY IND.) CPX-1; 9 caliber pistol bearing serial number 544805; (x) RUGER EC9S 9 caliber pistol bearing serial number 463-45049; (xi) GLOCK GMBH 20 10 caliber pistol bearing serial number UW092US; (xii) GLOCK GMBH 22 40 caliber pistol bearing serial number CCS753US; and (xiii) 13 rounds FEDERAL manufacturer 40 caliber ammunition.

**J.   Criminal History**

43.  On October 28, 2024, I reviewed SY's criminal history records and learned that SY has been convicted of the following felony crimes punishable by a term of imprisonment exceeding one year:

a.   On or about February 15, 2017, Grand Theft:

Money/Labor/Prop, in violation of California Penal Code Section 487 (A), in the Superior Court for the State of California, County of San Bernardino, Case Number FWV17003846;

      b.   On or about August 6, 2017, Second Degree Robbery, in violation of California Penal Code Section 211-212,5(C), in the Superior Court for the State of California, County of Orange, Case Number A566236;

      c.   On or about October 19, 2017, Second Degree Robbery, in violation of California Penal Code Section 211, in the Superior Court for the State of California, County of Los Angeles, Case Number NA10768201; and

      d.   On or about November 15, 2017, Sale/Possession of Metal Knuckles, in violation of California Penal Code Section 21810, in the Superior Court for the State of California, County of Los Angeles, Case Number RA144702.

    **K.**   **Interstate Nexus**

44.  Based on my review of January 21, 2025, and February 4, 2025, reports prepared by ATF SA Tiffany Lamphere, I know that SA Lamphere, who is an ATF Firearms and Ammunition Interstate Nexus Expert, examined the firearms SY sold to the CI, UC-1, and/or UC-2 between October 18, 2024, and January 22, 2025, and determined that the majority of the firearms[7] were manufactured outside of the State of California.  In order for

---

[7] SA Lamphere was unable to determine the origin of four of the firearms because they were privately-made and do not have serial numbers (also known as "ghost guns").  SA Lamphere was also unable to determine the origin of one other firearm which had an obliterated serial number.  SA Lamphere determined that the remaining firearms travelled in interstate or foreign commerce.

the firearms to have been recovered in California, they had to have moved in interstate or foreign commerce. In addition, SA David Gonzalez, examined pictures of the firearms recovered from SY when he was arrested in Los Angeles on February 3, 2025, and determined that in order for the firearms to have been recovered in California, they had to have moved in interstate or foreign commerce.

## V. TRAINING AND EXPERIENCE ON FIREARMS OFFENSES AND THE USE OF DIGITAL DEVICES IN FIREARMS OFFENSES

45. From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct firearms investigations, I am aware of the following:

a. Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such in their digital devices. It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals. Such information is also kept on digital devices.

b. Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices. These

photographs and recordings are often shared via social media, text messages, and over text messaging applications.

c.   Those who illegally possess firearms often sell their firearms and purchase firearms.  Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices.  This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price.  In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale.  In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

## VI. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>

46.   As used herein, the term "digital device" includes the SUBJECT DEVICE.

47.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have

been downloaded, deleted, or viewed via the Internet.  Normally,
when a person deletes a file on a computer, the data contained
in the file does not disappear; rather, the data remain on the
hard drive until overwritten by new data, which may only occur
after a long period of time.  Similarly, files viewed on the
Internet are often automatically downloaded into a temporary
directory or cache that are only overwritten as they are
replaced with more recently downloaded or viewed content and may
also be recoverable months or years later.

　　　　b.　Digital devices often contain electronic evidence
related to a crime, the device's user, or the existence of
evidence in other locations, such as, how the device has been
used, what it has been used for, who has used it, and who has
been responsible for creating or maintaining records, documents,
programs, applications, and materials on the device.  That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them.  For example, recoverable
data can include evidence of deleted or edited files; recently
used tasks and processes; online nicknames and passwords in the
form of configuration data stored by browser, e-mail, and chat
programs; attachment of other devices; times the device was in
use; and file creation dates and sequence.

　　　　c.　The absence of data on a digital device may be
evidence of how the device was used, what it was used for, and
who used it.  For example, showing the absence of certain

25

software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

    d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

    48.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

    a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

    b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

49.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

### VII. __CONCLUSION__

50.   For all of the reasons described above, there is probable cause to believe that Justin SY has committed a violation of 18 U.S.C. § 922(g)(1): Felon in Possession of a Firearm.   There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICE described in Attachment A.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 5th day of
February, 2025.

_____
HONORABLE MARGO A. ROCCONI
UNITED STATES MAGISTRATE JUDGE